## PURSELL v WOLVERINE-PENTRONIX, INC.

Docket No. 77-3720. Submitted June 15, 1979, at Lansing.—Decided August 20, 1979. Leave to appeal applied for.

C. L. Pursell was employed, at the age of 59, by Wolverine-Pentronix, Inc., which orally agreed to employ him until he reached retirement at age 65. Prior to reaching age 65, Pursell's employment was terminated. He brought an action against Wolverine-Pentronix for damages for breach of the oral employment contract. The trial court granted the defendant's motion for accelerated judgment, based upon the statute of frauds. The plaintiff appealed, and the Court of Appeals reversed and remanded for trial, 44 Mich App 416 (1973). The plaintiff had relied upon the doctrine of equitable estoppel to prevent the defendant from raising the defense of the statute of frauds. The Court of Appeals held that the facts adduced at trial might show sufficient reliance on the oral contract by the plaintiff, to his detriment, to estop the defendant from raising the defense. At the trial, at the conclusion of plaintiff's proofs, the Jackson Circuit Court, Charles J. Falahee, J., granted defendant's motion for a directed verdict, finding as a matter of law that the plaintiff had failed to establish that he had given up prior employment and substantial retirement benefits in reliance upon the oral agreement and that the defendant, therefore, was entitled to rely upon the statute of frauds as a defense. The plaintiff appeals. *Held:*

Reviewing the facts in the light most favorable to the plaintiff, reasonable men could differ on the question of whether the plaintiff acted to his detriment solely in reliance upon the oral agreement with the defendant. The trial court's grant of defendant's motion for a directed verdict was, therefore, error.

Reversed and remanded.

1. APPEAL AND ERROR — DIRECTED VERDICT — EVIDENCE.

The Court of Appeals will view the evidence in the light most favorable to a plaintiff who is appealing from a trial court

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 886.
[2] 73 Am Jur 2d, Statute of Frauds § 565.

order granting a defendant's motion for a directed verdict; the test for determining whether the motion should have been granted is whether or not evidence was offered upon which reasonable minds could differ.

2. FRAUDS, STATUTE OF — ESTOPPEL — EVIDENCE — QUESTION OF FACT — DIRECTED VERDICT.

An estoppel may be raised to defeat the defense of the statute of frauds where one has acted to his detriment solely in reliance on an oral agreement, and a trial court erred in granting a directed verdict for a defendant in a case in which the plaintiff presented sufficient evidence to raise a question of fact as to whether he acted to his detriment by giving up his prior employment and its substantial retirement benefits solely in reliance on an oral employment agreement with the defendant.

*Edward L. Cobb, P.C.,* and *Navarre & Navarre, P.C.,* for plaintiff.

*Levin, Levin, Garvett & Dill* (by *Leonard J. Grabow),* for defendant.

Before: ALLEN, P.J., and T. M. BURNS and D. E. HOLBROOK,* JJ.

D. E. HOLBROOK, J. Plaintiff sued defendant for breach of an oral employment contract, the circuit court granted defendant's motion for directed verdict, and judgment in favor of defendant was entered.

This case was first before the Court in *Pursell v Wolverine-Pentronix, Inc,* 44 Mich App 416; 205 NW2d 504 (1973). There the circuit court had granted defendant's motion for accelerated judgment based on the statute of frauds and this Court reversed and remanded for trial, stating in pertinent part as follows:

"The facts appearing in the plaintiff's complaint are

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

largely uncontested. In 1966, the plaintiff was 59 years old and employed by Dow Chemical as general manager of its plant in Jackson, Michigan. This plant was acquired by the defendant from Dow Chemical on September 1, 1966. The defendant offered to keep the plaintiff on as general manager, orally promising to employ him as vice-president until he reached retirement at age 65. In reliance on these promises, the plaintiff severed his employment with Dow Chemical and accepted the position offered by the defendant. In June of 1970, the defendant terminated plaintiff's employment thereby breaching the oral promise.

\* \* \*

"The plaintiff's first contention in this Court is that the trial court erred in dismissing his claim for damages resulting from the breach of the oral contract of employment.

"At the outset, it must be stated that a contract not to be performed within one year from its making must be in writing to be enforceable, MCLA 566.132(1); MSA 26.922(1), and that this rule applies to oral contracts of employment. *Adolph v Cookware Co of America,* 283 Mich 561 [278 NW 687] (1938); *Lynas v Maxwell Farms,* 279 Mich 684 [273 NW 315] (1937).

"The plaintiff concedes that the oral contract is covered by the above-cited rule but argues that the defendants are estopped from raising this defense.

"The doctrine of equitable estoppel, upon which the plaintiff relies is set forth in 3 Williston, Contracts (3d ed), § 533A, p 796:

" 'Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the Statute of Frauds.'

"In the instant case, plaintiff argues that the *giving up of his prior employment and the substantial retirement benefits that accompanied it* constituted sufficient reliance within the meaning of the doctrine. The defendants counter this argument with the proposition that the giving up of other employment is not sufficient to invoke the doctrine of estoppel. In support of this proposition the defendant cites *Adolph v Cookware Co of America,* 283 Mich 561 [278 NW 687] (1938); *Gude-*

*nau v Farm Crest Bakeries,* 268 Mich 399 [256 NW 462]
(1934), and *McLaughlin v Ford Motor Co,* 269 F2d 120
(CA 6, 1959). The holdings of these cases are adequately
stated in *McLaughlin, supra,* 124, 125, in the following
language:

" 'The exception recognized by that case and in some
other jurisdictions is that the oral agreement is not
affected by the Statute of Frauds if it is supported by a
consideration separate and apart from its performance,
such as where the plaintiff has given up something to
the defendant for which it would not be compensated
unless the agreement was enforced. * * * The action of
the appellant in giving up his position with the General
Motors Corp. was only a necessary incident in placing
himself in a position so that he might perform his
agreement with the Ford Motor Company. This confer-
red no benefit upon the Ford Motor Company and was
not a separate consideration passing from the appellant
to the Ford Motor Company within the meaning of the
rule. *Lynas v Maxwell Farms,* 279 Mich 684, 689; 273
NW 315 [1937]; *Adolph v Cookware Co of America,* 283
Mich 561, 568; 278 NW 687 [1938].'

"Thus, these cases did not deal with the problem of
estoppel and are not controlling.

"A careful review of the law in this state reveals that
the only case dealing with the doctrine of estoppel as
applied to a factual situation similar to the instant case
is *Oxley v Ralston Purina Co,* 349 F2d 328 (CA 6, 1965).
In *Oxley, supra,* the plaintiff underwent considerable
expenditures to begin to operate a 'hog leasing' pro-
gram as a result of an oral agreement with the defen-
dant. The Court upheld the trial judge's finding that
the defendant was estopped from asserting the Statute
of Frauds.

"Granted, there may be a difference between the
spending of a large amount of money in reliance on an
oral contract and one's giving up of his employment.
However, the doctrine of equitable estoppel applies in
those cases where its application is called for by the
facts. *Oxley, supra.*

"In the instant case, the facts adduced at trial may
show that in this particular case, there was sufficient

reliance to estop the defendant from raising the Statute of Frauds as a defense. Therefore, the granting of the motion for accelerated judgment was improper." (Emphasis added.)

Trial of the case commenced on July 18, 1977. At the conclusion of plaintiff's proofs, the motion of the defendant for a directed verdict was granted on the grounds that plaintiff, as a matter of law, had failed to establish that he gave up prior employment and substantial retirement benefits with Dow and that, therefore, no estoppel was present and defendant was entitled to assert the statute of frauds as a defense.

The rule as to motions for directed verdicts is clearly stated in the case of *Light v Schmidt,* 84 Mich App 51, 59; 269 NW2d 304 (1978), as follows:

"When a defendant is seeking a directed verdict, the motion may be offered at the close of plaintiff's evidence. GCR 1963, 515.1. On appeal from a trial court order granting defendant's motion for a directed verdict, this Court will view the evidence presented in the light most favorable to the plaintiff. *Cody v Marcel Electric Co,* 71 Mich App 714; 248 NW2d 663 (1976), *lv den,* 399 Mich 851 (1977), *Hensley v Colonial Dodge, Inc,* 69 Mich App 597; 245 NW2d 142 (1976). The proper test for determining whether the motion should be granted is whether or not evidence was offered upon which reasonable minds could differ. *Armstrong v LeBlanc,* 395 Mich 526; 236 NW2d 419 (1975)."

In this case we must determine if there was sufficient evidence presented by plaintiff to raise a question of fact as to whether plaintiff acted to his detriment solely in reliance on the oral agreement with the defendant.

The plaintiff, Mr. Pursell, testified that he was manager of the Jackson plant, that he had been

an employee of Dow for more than five years at the time of negotiations by defendant with Dow for the purchase of the Jackson plant, and that he was never terminated by Dow. It was his desire to continue to work for Dow. He had a good record with Dow and inquired of Mr. Ansell, his boss, about a transfer to the Madison plant near St. Louis, Missouri, and also made inquiry of Personnel at the home office at Midland about transfer to another Dow position if and when the Jackson plant was disposed of by Dow. The person at Personnel replied: no problem, let us know 90 days ahead of that time. Mr. Ansell, plaintiff's boss, said plaintiff was a capable person and he would like to have Pursell with him and would recommend to Dow that he come with him to the Madison plant. Mr. Herbert Lyon, on the board at Dow, testified that to his knowledge there was no one at Dow that objected to Mr. Pursell continuing to work for Dow. He also stated that Dow had an executive pool that Mr. Pursell was qualified to be assigned to, should his position at the Jackson plant be discontinued. Mr. Lyon also testified:

"Q. *[by Mr. Cobb]* Mr. Lyon, you were asked in your January 1975 deposition did you make an effort to place people in the organization who were displaced by reason of this sale to other organization?

"MR. GRABOW: Would you repeat.

"Q. Did you make an effort to place people in the organization? The answer was,

" 'We certainly did. The Dow Chemical Company does not sell off a facility and jerk it right out from under the employees and cast them loose. That is what I don't like about the word termination.'

"Q. That's what I was trying to get at, company policy. The answer was,

" 'I felt that we make every effort to place the employees in a situation of that sort.' "

It was established that plaintiff's five years' service would qualify him for the regular Dow retirement plan should he be placed in the Dow organization that had the plan; that under the plan and with his five years of credit with Dow, he would have 11 years of credit at age 65 and be entitled to substantial benefits.

Mr. Pursell, the plaintiff, testified concerning the conversation he had with defendant corporation's officers: Mr. Donald Smith, Chairman of the Board, the executive vice-president, Mr. Clark, and an accountant and another person connected with the defendant. This testimony is as follows:

"Q. *[Mr. Cobb, plaintiff's attorney]* Did something come up concerning sale of the Plant and your continuing employment with Dow?

"A. Yes, Mr. Smith asked me what I needed to run the Plant as the Manager of the Plant and I said, 'It isn't my intent to work for you.' He said, 'Well I can't use this Plant unless you do' and then we got into a discussion of what he could offer.

"Q. Did the question of your age come up?

"A. Yes, I told him I was getting too far along in life to be making transfers to another corporation and thought it was best for my family to stay with Dow in order to accumulate credit for pension fund.

"Q. In connection with negotiations to retain you as Manager was this subject discussed?

"A. Yes, Mr. Smith asked how much money I made.

"MR. GRABOW: These questions are all narrative questions, and I am put in the position because of the questions Mr. Cobb is asking.

"MR. COBB: I merely asked if the question of age came up in connection with the discussion.

"MR. GRABOW: You are asking for a narrative.

"THE COURT: That's yes or no. Did the question of age come up?

"THE WITNESS: Yes.

"Q. What was the subject of the age matter?

"A. I said I was too old to be changing jobs and for the protection of my family I should stay with Dow.

"Q. Were you 59 then?

"A. Yes.

"Q. What was his response?

"A. He said, 'How much do you think you would get in the Dow pension' and I said, 'I never checked it but I thought in the area of $500 a month at age 65.'

"MR. GRABOW: I have to protect the record and we have nothing to do with Dow pension unless it is established he was under the Dow Chemical plan.

"THE COURT: I think you can go into this on cross-examination if there was one or two Dow pensions.

"Q. What did he respond?

"A. He said $500 was peanuts and they didn't believe in pensions and would put me in profit sharing which was a better paying proposition based on profit and he asked how much I made and he said I will raise you at least $2,500 a year.

"Q. What did you receive at this time?

"A. At this time Dow was paying me $20,000 a year and he said I will start you at 22,500 and I will let you know in a couple of days after we talked it over. That will be a minimum.

"Q. Did he offer anything else?

"A. Yes, 'Does Dow furnish you with a Company Car.' I said, 'No' and he said, 'We would intend to give you a Company Car.' Indicating in the Buick class and he said, 'At least a $4,000 car.' He said, 'Are you getting vacations and insurance' and I said, 'Yes, both' and he said, 'How much is your insurance' at that time Dow was paying double of the salary $40,000 of life insurance and he said, 'We will give you far more insurance than that, at least two and a half times your salary.'

"Q. Did the question of entertainment or travel come up?

"A. Yes, he said, 'Does Dow furnish you with entertainment expense' and I said, 'We had very little entertainment expenses' and he said, 'Do you belong to the Country Club' and I said, 'Yes' and he said, 'Does Dow pay for the Country Club' and I said 'No' and he said, 'All of our Vice Presidents are paid to belong to the

Country Club and we will pick up your tab' and he said 'Do you have a credit card' and I said, 'No' and he said, 'All of our employees have Standard Oil credit cards and you will have that for yourself.'

*    *    *

"Q. (By Mr. Cobb) Mr. Pursell, you were talking about negotiations with Mr. Smith concerning your employment contract. Did you talk about insurance.

"A. Yes, Mr. Smith asked me how much insurance Dow carried on my life insurance and I said 'two times the amount of the salary and he said, 'We would give you two and one half times the salary plus a $17,000 Phoenix policy' which I think brought it around to $82,000 in coverage and said, 'We will furnish Blue Cross, Blue Shield.' I guess we covered it.

"MR. GRABOW: If the Court please, I hate to interrupt again. Mr. Cobb I am sure knows this is true in this Jury case asking about insurance is asking a leading question.

"THE COURT: It was testified to anyway this morning the same thing. I think it is already in the record.

*    *    *

"Q. Were retirement benefits discussed of Dow versus Wolverine?

"A. Yes. Mr. Smith asked me what age I retired under the Dow Plan and I said, 'Age 65' and he said, 'Well we don't have any age limits in our Company. A man can work as long as—

"MR GRABOW: Objection, materiality. The complaint is based on age 65, Your Honor. I have to object again Counsel doesn't know his own declaration.

"THE COURT: Bear in mind Jurors the claim is not beyond age 65. As to any testimony beyond age 65, no damages can be assessed.

"Q. Did you discuss with him your concern that you would be employed until your retirement age and in effect only six years from retirement?

"MR. GRABOW: Objection that's the most leading question I have heard in the last 20 years of my practice.

"THE COURT: Well, it is hard some times to draw the line between what is leading and what isn't.

"MR. GRABOW: I realize that and I have tried to withhold my natural reaction.

"THE COURT: I will overrule.

"MR COBB: He can answer.

"THE WITNESS: Yes, I told Mr. Smith at that time I felt I was too old to be switching plans and it was at that time he said 'How old are you and how long and when do you retire under Dow.'

"Q. What did you tell him?

"A. I told him Dow had a retirement plan at age 65 and he said 'We don't have any age limits.'

"Q. What was your present age at that time?

"A. At that time I was 59.

"Q. When is your birthday?

"A. August 24, 07.

"Q. And what did he respond to your comment that you were too old to switch plans?

"A. He said in that connection, 'We don't have an age limit. As a matter of fact we have people 65 and older still working for us.'

\* \* \* .

"Q. Did you get any assurance from him concerning employment and the age time?

"A. Yes, Mr. Smith said that he would hire me at least until age 65.

"Q. Now, did you ask for an employment contract?

"A. Yes, after all these offers had been made I said, 'Mr. Smith I think we should have some kind of written agreement.' He said 'We don't give written agreements if a man's word and a handshake isn't good then we better not talk any further.' At that time he pulled out of his pocket a Prudential.

"MR. GRABOW: Just a moment, Mr Pursell. Your Honor. I realize my prior objections have been stated and I will not repeat them. He is now talking about pulling something out of his pocket and it is not at all responsive to the question and if you read back the question there is no element of response, if there is an

area he wants to talk about it is not being done in anything approaching proper procedures.

"THE COURT: Barbara will you read back that last question?

"Reading: Did you ask for an employment contract?

"THE COURT: And the answer is yes or no.

"THE WITNESS: Yes, sir.

"Q. What was his response to your request for a written contract?

"A. He said we do not have written contracts. We think a man's word is sufficient and if we can't have it on a handshake we better not talk any further. Then he handed me a copy of a Prudential Life Insurance note for a million and one half dollars.

"Plaintiff's Exhibit 2 marked.

"Q. Will you identify this copy, Mr. Pursell?

\* \* \*

"A. A proposal for one and a half million dollar loan for Wolverine and he handed that to me and said 'These people think our word is good and if they think so I think you should think so too' or words to that effect."

The proper test for determining whether a plaintiff should be granted a motion for directed verdict is whether reasonable men could reach different conclusions from the facts taken in the light most favorable to the plaintiff.

After a careful review of the facts in this case as stated herein, we rule that reasonable men could reach different conclusions as to whether plaintiff acted to his detriment solely in reliance on the oral agreement with the defendant. We therefore find that the trial court erred in granting the motion for directed verdict in favor of defendant.

Reversed and remanded for a new trial. Costs to plaintiff.